UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CHINLI MOU,

          Plaintiff,

    v.

NANCY BERRYHILL,[1]

          Defendant.

Case No.  15-cv-05194-JCS

**ORDER ON MOTIONS FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 17, 18

## I.    INTRODUCTION

Plaintiff Chinli Mou seeks review of the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying her application for disability benefits under the Social Security Act.  Mou asks the Court to reverse the Commissioner's denial of benefits and remand for an award of benefits, or, in the alternative, for further administrative development.  The Commissioner requests the Court affirm denial of benefits to Mou, or, in the alternative, deny Mou's request for an instruction to award benefits and instead remand for further administrative development.  For the reasons articulated below, the Court GRANTS Mou's Motion for Summary Judgment, DENIES the Commissioner's Motion for Summary Judgment, reverses the decision of the Commissioner, and remands for further administrative proceedings.

## II.    BACKGROUND

### A.    Procedural History

On January 6, 2012, Mou applied for disability insurance benefits, alleging she was unable to work due to depression, high blood pressure, and emotional stress beginning December 10,

---

[1] Nancy Berryhill became the Acting Commissioner of Social Security on January 23, 2017, and is therefore substituted for Carolyn W. Colvin as the Defendant in this action. See 42 U.S.C. § 405(g); Fed. R. Civ. P. 25(d). This Order refers to Berryhill as the "Commissioner."

United States District Court
Northern District of California

2005 until the December 31, 2008 date she was last insured.  Administrative Record ("AR," dkt. 14) at 12–13, 150.  The Social Security Administration denied Mou's claim on April 24, 2012, and affirmed the denial on reconsideration on November 5, 2012.  *Id.* at 150–53, 155–59.  Mou filed a written request for a hearing regarding these disability benefits on January 8, 2013.  *Id.* at 160–61.  Following an initial hearing by Administrative Law Judge Frederick C. Michaud, the matter was reassigned to Administrative Law Judge Brenton L. Rogozen (the "ALJ") who held a supplemental hearing on January 21, 2014 and issued a decision on March 17, 2014 finding Mou not disabled.  *Id.* at 12–26; 100–35.  The Social Security Administration Appeals Council considered and denied Mou's request for review on September 11, 2015, finding "no reason under [its] rules to review the Administrative Law Judge's decision."  *Id.* at 1.

Mou filed the present action on November 12, 2015 pursuant to 42 U.S.C. § 405(g), which gives the Court jurisdiction to review the Commissioner's final decision.  This action was reassigned to the undersigned magistrate judge on June 6, 2016, and the parties have consented to the jurisdiction of a United States magistrate judge pursuant to 28 U.S.C. § 636(c). The parties have filed cross motions for summary judgment pursuant to Local Rule 16-5.  *See* Pl.'s Mot. (dkt. 17); Def.'s Mot. (dkt. 18).

### B.   Mou's Background

#### 1.   Personal History Prior to Alleged Onset Date

Mou was born in Taipei, Taiwan on December 2, 1962, where she was raised as the oldest of three girls in a college-educated family.  AR 336.  Mou considered herself to be a shy kid, but held a small group of close friends and also attended painting and ballet lessons.  *Id.*  In middle school, Mou devoted her free time to the high school entrance exam, which led to Mou qualifying for the top public high school for girls in the area.  *Id.*  During high school, Mou took a university entrance exam and was selected for a prestigious co-ed college.  *Id.* at 336–37.  During high school, many of her classmates had secret boyfriends despite a prohibition on contact with boys, but Mou did not because she "always follow[s] rules."  *Id.* at 336.  During college, Mou was allowed to date but had a strict curfew and was not allowed to smoke, drink, or use drugs.  *Id.* at 337.  Once again, Mou "did not fight those rules," because "they were good for [her].  [She] was

taught to be good." *Id.* Mou went to several dances and started dating Steven Yang, an electrical engineering student, during her third year of college. *Id.*

Following college, Mou held a series of jobs in Taipei, working as a computer programmer and later maintaining a successful career for a consulting firm. *Id.* After marrying Steven Yang in May 1988, Mou and Yang moved to the United States so Yang could obtain a master's degree from University of Maryland. *Id.* at 337–38. Mou and Yang then moved to Silicon Valley where they bounced around various jobs. *Id.* at 338. Between 1990 and 1998, Mou began working in the United States as a computer programmer and eventually transitioned into consulting work once more. *Id.* In 1996, Mou was offered a promotion into a management position but turned it down because she felt that her English was not good enough to manage people. *Id.* From 1998 to 2000, Mou decided to obtain a master's degree in computer systems at Washington City University. *Id.* Mou enjoyed being back in school and maintained a GPA of 3.8 during her time at Washington City University. *Id.* When she wasn't at work or school, Mou enjoyed spending time at libraries to improve her command of the English language and study various topics, visiting every Bay Area library she could. *Id.* at 332, 338.

### 2. The King Library Events and Subsequent Personal History

In Fall 2004, Mou encountered the first in a series of difficult situations at the Martin Luther King Library ("King Library") at San Jose State University—a university library Mou frequented often. *Id.* at 332. On one occasion, a Chinese patron of the library complained when Mou and her husband were talking in a portion of the library designated for talking. *Id.* Mou told the man the library rules allowed people to talk in the area, but library security was eventually called and Mou was told to leave the library. *Id.* Sgt. John Laws of the San Jose University State Police Department was involved in resolving this incident. *Id.* Mou immediately felt the incident was unfair, "since she had not broken any rules." *Id.*

On February 4, 2005, Mou once again visited the King Library to check out some books. *Id.* As she was leaving the library that day, Mou passed through a security checkpoint at the same time as an elderly Caucasian man, at which point the checkpoint's alarm rang. *Id.* Mou was stopped by a Library Security Officer ("LSO"), Irene Wong, and forced to go through the

United States District Court
Northern District of California

1    checkpoint again while the Caucasian man was not stopped at all.  *Id.*  Mou asked Wong "why

2    didn't you stop the other guy?  This is not fair!"  *Id.*  Wong looked angry and told Mou to identify

3    herself and wait as she called her supervisor.  *Id.*  Mou stated she was planning on complaining to

4    Wong's supervisor, but proceeded to take her library books and leave to catch her bus.  *Id.*

5    　　　On February 7, 2005, Mou returned to the King Library to browse the DVD collection.  *Id.*

6    While browsing, she was approached by Sgt. Laws who asked Mou for her name and birthdate.

7    *Id.*  Mou responded with "Karen," a name she frequently used in place of her Chinese name, and

8    provided her birthdate.  *Id.*  Sgt. Laws then grabbed Mou's purse and told her that she provided

9    him with the wrong name, and that he was arresting her for using a fictitious name.  *Id.*  Following

10   this incident, Laws took Mou to a police station in San Jose, where she was held for several hours,

11   and gave her a citation stating she could not return to the King Library for one week and a paper to

12   sign promising to appear in court.  *Id.*  This event was the first time Mou was involved in criminal

13   proceedings in any capacity, and she began looking for an attorney to deal with the matter.  *Id.*

14   　　　On February 23, 2005, Mou returned to King Library to spend time in the sixth-floor music

15   room.  *Id.* at 333.  That day, Mou left the music room to use the restroom and accidentally locked

16   herself out of the room.  *Id.*  At the main circulation desk, one of the librarians told Mou not to

17   worry and that it happens all the time, and sent an LSO to help her get back in.  *Id.*  LSO Fritz van

18   der Hoek then discovered that Mou had used her husband's library card to check out the music

19   room key.  *Id.*  Mou asked to speak to Fritz van der Hoek's supervisor, Sgt. Laws, who told Mou

20   she was not allowed to use the sixth floor anymore and refused to allow her to retrieve her things.

21   *Id.*  After this conversation, Mou spoke with a supervisor at the main circulation desk who

22   eventually let Mou back into the music room for the remainder of her time.  *Id.*  As she was

23   leaving the library, Mou spoke with some of the other security officers at the security desk, asking

24   why she was penalized by Sgt. Laws for using the wrong library card.  *Id.*  Sgt. Laws subsequently

25   appeared and tried to arrest Ms. Mou for "interfering."  *Id.*  Sgt. Laws gave Mou a citation for

26   trespassing, told her she could not use the library for one to two weeks, handcuffed her, and

27   threatened to take her to jail.  *Id.*  Mou begged him to let her sign the citation instead, and Sgt.

28   Laws eventually relented and let her go.  *Id.*  Mou states that she was very upset from this

encounter, describing her state of mind following these events accordingly—

> I was really, really publicly humiliated!  It was really wrong!  I
> followed every direction! . . . I came to this country.  I followed the
> immigration laws.  I paid taxes.  What did I do, to deserve this?  I
> want to be a good citizen!  I deserve to have equal rights!

*Id.*

Following the King Library events, Mou's day-to-day personal life was substantially altered in several respects.  As a result of and following these events, Mou claims she was unable to work in any capacity as she "could not function," and spent "at least two years crying at home all day long," as a result of the incident.  *Id.* at 112.  Mou explains these incidents led to her being unable to perform basic tasks such as cooking, cleaning, or grocery shopping; her becoming socially isolated from friends and loved ones; and were directly responsible for her divorce from her husband in October 2005.  *Id.* at 116–17, 334.  Mou claims the King Library events continue to make her depressed, nervous, and anxious despite her having attended weekly psychotherapy sessions and trying antidepressants.  *See id.* at 115–17; 334–35.

Yang, Mou's former husband, also submitted a declaration letter dated October 3, 2013 to the ALJ detailing his thoughts on Mou's depression, anxiety and ability to function at the time of writing.  *Id.* at 245.  In his letter, Yang stated that he and Mou filed for divorce in October 2005 for irreconcilable differences which was finalized in April of 2006.  *Id.*  Since filing for divorce, Yang has "been helping Ms [sic] Mou in every aspect [he] could; however, her depression, anxiety, and feeling insecure seems unimproved, but getting worse.  Those symptoms make it impossible for Ms [sic] Mou to stay at work or get back to work."  *Id.*  Specifically, Yang stated that he has helped Mou following divorce in a variety of ways, "including but not limited to, paying medical insurance premium [sic] and bills, property tax, Home Owner Association Fees, utility bills, etc."  *Id.*  Yang also indicated that his remarriage and new family make it "even more difficult for [him] to continue [sic] support Ms. Mou," and that "[w]ith her current condition, Ms [sic] Mou won't be able to join the workforce to support herself."  *Id.*

United States District Court
Northern District of California

5

### 3. Medical History

#### a. Dr. Leith's Statement

Dr. Ronnie Sue Leith performed an independent psychiatric evaluation for Mou in anticipation of Mou's civil rights litigation in 2007 pertaining to the King Library events. *Id.* at 330. Dr. Leith completed her evaluation on August 24, 2007, at which point she assessed Mou's emotional state and rendered a medical opinion regarding Mou's mental health. *Id.* Dr. Leith based her opinions on four hours of in-person interviews with Mou as well as review of Mou's verified complaint for damages, Mou's deposition transcripts, police reports, and letters from Sgt. Laws to Yang and Mou. *Id.* Dr. Leith ultimately concluded, "with a reasonable degree of medical certainty, that Ms. Mou suffered an episode of Major Depressive Disorder as a result of being detained and arrested twice at the Martin Luther King Library in February 2005," and that "[h]er depression has persisted to the present day, and it is mixed with a significant component of anxiety." *Id.* at 340. Dr. Leith memorialized Mou's own description of the background and events discussed above.

#### i. Mou's Symptoms and Current Functioning

As discussed above, Mou subjectively believed the King Library events profoundly impacted her ability to maintain personal relationships and subsequently led to her divorce, inability to work, and personal social isolation. *Id.* at 116–17, 334. In her meetings with Dr. Leith, Mou also discussed several other emotional and mental issues that arose from these events.

First, Mou told Dr. Leith that "after February 7, 2005, she was 'frightened and scared' every time she went to the King Library." *Id.* at 333. She noticed that she began making mistakes such as locking herself out of the music room at the library or using the wrong library card when she went to the King Library—mistakes that "occurred only when she was in the King Library." *Id.* at 334. More generally, Dr. Leith describes Mou's impression of her emotional state as follows:

> She said that after the two incidents in February 2005, she "cried and cried" when she was at home. She wasn't able to sleep; she would fall asleep and then awaken with nightmares of being arrested, or of people chasing her. She didn't feel like eating, and initially lost weight, although she subsequently gained it back. She

United States District Court
Northern District of California

1     said that for a while, she was afraid to go out: "I didn't know what
      would happen to me.  This place has no justice!"

2   *Id.*

3         Mou claims that despite criminal charges against her eventually being dropped, she

4   continued to be upset by what had happened to her.  *Id.*  As a result of the events, Mou "became

5   convinced that she had been 'bullied' because of her poor command of spoken English."  *Id.*  Mou

6   decided to file a civil lawsuit "because she felt that the police had intentionally tried to bully her,

7   'and ever since [Mou] was small, [she] was told to fight back with bullies.'"  *Id.*  Mou also

8   attributes her divorce to the King Library events in that "her husband, Steven Yang, never

9   supported her in her wish to obtain justice," and that "they argued daily about her decision to file a

10  lawsuit."  *Id.*  Eventually, their arguments came to a head when Yang "began to complain that he

11  couldn't handle her being so upset, and that he didn't have time to make calls for her, because he

12  had to work."  *Id.*  Yang filed for divorce in October 2005.  *Id.*

13        As of the date of Dr. Leith's medical statement—August 24, 2007—Mou claimed that her

14  depression and anxiety were still present, and when she was reminded of the events, her symptoms

15  were "as intense as they ever were."  *Id.*  Mou was still only regularly getting two to three hours of

16  sleep a night, constantly having nightmares, and "[o]n two occasions within the past few months,

17  she has had thoughts of suicide."  *Id.* at 334–35.  These suicidal thoughts came as the result of

18  mental lapses such as forgetting about a boiling pot of water such that the pan boiled dry.  *Id.* at

19  335.  Dr. Leith noted that Mou told her "these lapses made her feel 'useless': 'I was always

20  perfect!  I've become really stupid!  I should just die.'"  *Id.*  Mou had taken paralegal courses at

21  West Valley College, where a professor referred her to a school counselor after noticing her crying

22  in class.  *Id.*

23        Dr. Leith describes Mou's typical day at the time of her 2007 examination as follows:

24     She said that she is living alone, in the townhouse that she and her
       husband own and formerly occupied together.  Mr. Yang moved out
25     earlier this year.  Ms. Mou awakens between 2:00 and 4:00 a.m., and
       is unable to go back to sleep.  Sometimes she gets up and starts her
26     day, and other times she remains in bed until around 6:00 a.m.
       During the school term she would get up, get dressed, eat breakfast,
27     and leave for school.  She uses public transportation, and the trip to
       campus took an hour.  She would eat lunch on campus , and return
28     home between 5:00 and 6:00 p.m.  She would fix herself a light

United States District Court
Northern District of California

1

2

3

dinner, and then would try to study.  Sometimes she goes to a movie at night, alone or with friends, to try to distract herself so that she can fall asleep.  She goes to bed at 10:30 or 11:00 p.m., but has difficulty falling asleep; at times she may lie awake until 1:00 a.m.  On the weekends, she reads books, does homework, and swims.

4

*Id.*

5

### ii.  Psychological Testing and Results

6

In addition to interviewing Mou regarding her past personal history and the symptoms she

7

experienced following the King Library events, Dr. Leith also reviewed and summarized

8

psychological tests performed by Dr. Joanna Berg on July 27, 2007 to support Dr. Leith's ultimate

9

medical opinions.  *Id.* at 338.  As an initial note, Dr. Leith found that "Ms. Mou participated

10

willingly in the testing, and there was no reason to doubt either her effort or the validity of the test

11

results."  *Id.*  Mou was administered a variety of psychological tests, including the Minnesota

12

Multiphasic Personality Inventory-2 (MMPI-2) and the Millon Clinical Multiaxial Inventory-III

13

(MCMI-III) tests.  *Id.*

14

Mou's "MMPI-2 profile depicted her as 'a relatively inflexible individual who lacks

15

psychological sophistication.'"  *Id.*  While Mou presented herself for these tests with a "slightly

16

exaggerated positive self-image in a somewhat guarded manner," there was "clear evidence of

17

depression, tension, and anxiety."  *Id.*  Mou's MMPI-2 profile also indicated that Mou is

18

"'exquisitely sensitive in interpersonal reactions,' and she experiences herself as being unjustly

19

treated."  *Id.*  The MMPI-2 profile revealed that Mou "feels hopeless and immobilized by her

20

chronic worry and distress," and that Mou "generally sees the world as a threatening place."  *Id.*

21

Mou's MMPI-2 profile also showed the existence of long-term personality problems, the precise

22

nature of which were unclear "because of her overly-positive presentation of herself."  *Id.*

23

Dr. Leith stated the MCMI-III profile generally corroborated the findings of the MMPI-2

24

profile—that Mou was "currently experiencing significant symptoms of anxiety and depression,"

25

despite her attempts to be perceived in a positive light and downplay her negative feelings.  *Id.* at

26

339.  Based on this testing, Mou was described as "'likely to be naive and somewhat immature' in

27

her interpersonal relationships."  *Id.*  Mou was also given the Thematic Apperception Test where

28

Mou was "primarily descriptive of the pictures, but revealed sad affects throughout."  *Id.*  Overall,

United States District Court
Northern District of California

8

Dr. Leith concluded "[t]he psychological test findings were consistent with a diagnosis of Major Depressive Disorder." *Id.*

### iii. Medical Findings and Opinions

Ultimately, Dr. Leith came to the opinion, "with a reasonable degree of medical certainty, that Ms. Mou suffered an episode of Major Depressive Disorder as a result of being detained and arrested twice at the Martin Luther King Library in February 2005. Her depression has persisted to the present day, and it is mixed with a significant component of anxiety." *Id.* at 340.

Dr. Leith explained the "diagnosis of Major Depressive Disorder is based upon Ms. Mou's complaints of sadness, feelings of helplessness and hopelessness, loss of interest in social activities, sleep disturbance, anxiety, fatigue and loss of energy, difficulty concentrating, feelings of worthlessness, and thoughts of suicide." *Id.* Dr. Leith went on to state that "these symptoms began after the events of February 2005, and they have intensified over time as she has continued to feel unsupported in her complaints." *Id.* Dr. Leith also found that "[t]he results of the MMPI-2 and the MCMI-III administered by Dr. Joanna Berg substantiate Ms. Mou's self-report, showing significant degrees of depression, worry and anxiety." *Id.* Based on her review of psychological and other medical records, Dr. Leith rated Mou at a 45 on the Global Assessment of functioning, "which denotes serious impairment in social and occupational functioning." *Id.* at 341.

Dr. Leith went on to state "Mou's reaction to the events of February 2005 has been both intense and persistent; but [Dr. Leith] believe[s] it can be understood in light of her cultural background and her personality makeup." *Id.* Dr. Leith indicated that Mou's personality, and in particular, "[h]er sensitivity to interpersonal slights makes her quick to take offense," such as in the King Library events, where "[t]he more the situation escalated, the more misunderstood she felt and the angrier she became." *Id.* Dr. Leith noted that the King Library altercations were always with other Asians, which likely exacerbated Mou's reaction to the events, as "[f]eeling at a competitive disadvantage with other Asians because of her language 'disability' may have further contributed to Ms. Mou's intense response." *Id.* Dr. Leith pointed to Mou's rigid personality structure as an additional exacerbating factor, as "[s]he has been overwhelmed with a sense of victimization; and she is determined to pursue redress."

United States District Court
Northern District of California

United States District Court
Northern District of California

Dr. Leith noted that "[t]he frustration she has experienced as she seeks vindication has increased [Mou's] sense of alienation from society and exacerbated her feelings of isolation and depression." *Id.* at 342.  Specifically, Dr. Leith found that Mou's divorce and inability to work following the King Library events came as the result of those events in that Mou's "preoccupation with this matter has cost her her marriage, since her husband proved to be unsupportive, and it has prevented her from returning to work." *Id.*  Dr. Leith concluded by finding "that Ms. Mou has suffered a major depressive disorder as a result of the events in the King Library in February 2005. Her personality structure and cultural factors may have increased her vulnerability to such injury." *Id.* at 342.  Dr. Leith noted that Mou's "complaints of depression and anxiety are supported by the results of psychological testing, and there is no evidence of symptom exaggeration or malingering." *Id.*  Finally, Dr. Leith stated that Mou's depression has "been inadequately treated by the Chinese medicine she prefers," and that she "would probably benefit from treatment with antidepressant medication and supportive psychotherapy, extending for approximately one year beyond the resolution of the lawsuit." *Id.*

### b.  Dr. Chiu's Mental Medical Source Statement

Dr. Collins Chiu began acting as Mou's treating psychologist on August 22, 2012, providing weekly therapy sessions for Mou from that date forward. *Id.* at 278.  In her Mental Medical Source Statement, dated June 24, 2013, Dr. Chiu listed August 22, 2012 as the alleged onset date, "as this is the date [the] patient alleges becoming disabled." *Id.*  In the space available to indicate a different onset date if Dr. Chiu found such a date "more appropriate" than the date identified by Mou, Dr. Chiu wrote "N/A." *Id.*  The Court notes that although Dr. Chiu indicated that Mou had alleged an onset date of August 22, 2012, Mou's filings with the Social Security Administration specify an onset date of December 10, 2005, *e.g.*, *id.* at 222, 231, 240, 244, and one of her pre-hearing briefs states that she was "unable to amend [her] alleged onset date to August 22, 2012 as that date is subsequent to her December 31, 2008 Date Last Insured," *id.* at 251.

Following her sessions with Mou, Dr. Chiu identified the following psychological conditions or symptoms present in Mou: depression, loss of interest in activities, memory deficits,

1   easy distractibility, appetite disturbance, anxiety/panic attacks, decreased energy, sleep

2   disturbance, problems interacting with the public, difficulty with concentration, and feelings of

3   guilt and/or worthlessness.  *See id.* at 278.  Dr. Chiu also noted isolation/social withdrawal, mood

4   swings, nightmares, social/interaction difficulties/conflicts, difficulty making daily decisions,

5   inability to drive, and feeling overwhelmed as additional symptoms present in Mou at the time of

6   the report.  *Id.*

7          In analyzing the impact of Mou's symptoms on her ability to perform work-related mental

8   functions, Dr. Chiu found that Mou's understanding and memory, sustained concentration and

9   persistence, social interaction, and ability to perform other functional tasks were all moderately or

10   markedly limited.[2]  *See id.* at 279–80.  In her analysis, Dr. Chiu stated that her assessment of

11   Mou's understanding and memory was directly based on Mou's inability to sustain or keep work

12   since 2005 due to the severity of her symptoms.  *Id.* at 279.  Similarly, Dr. Chiu explained that her

13   conclusions on sustained concentration and persistence levels were based on Mou's inability to

14   perform work since 2005 and self-reported difficulty in listed tasks.  *Id.* at 280.  With respect to

15   functional limitations and limitations to social interaction, Dr. Chiu identified as the grounds for

16   her opinion Mou's reports of having significant difficulties with trusting people, interacting with

17   others, and maintaining relationships, as well as her lack of a social support network.  *Id.*

18   Additionally, Dr. Chiu found that on a monthly basis, Mou "would report episodes of

19   decompensation, mainly due to social/interpersonal conflicts with people.  As a result, [she] would

20   experience . . . depressive and anxiety symptoms."  *Id.* at 281.  Dr. Chiu concluded that the listed

21   limitations lasted twelve continuous months at the assessed severity, drugs and alcohol were not

22   contributing factors to the disability, and Mou was not a malingerer.  *Id.* at 279, 281.

23          While Dr. Chiu explicitly pointed to August 22, 2012 as the onset date for the symptoms,

24

25   [2] Dr. Chiu's report defines "moderate" limitations as "[a]ble to perform designated work-related
     mental functions, but will have limitations that impair the effective performance of the task
26   incrementally for a total between 11% to 20% of the 8-hour workday or 40-hour workweek."  AR
     at 279.  "Marked" limitations are defined as "[a]ble to perform designated work-related
27   mental functions, but will have limitations that impair the effective performance of the task incrementally
     for a total of more than 20% of an 8-hour workday or 40-hour workweek."  *Id.*
28

diagnoses, findings, and limitations detailed in her report, Dr. Chiu's reports include several statements that indicate at least some symptoms actually began in 2005, around the time the King Library events occurred.  For example, in the section of Dr. Chiu's medical report devoted to how Mou's conditions and/or symptoms impacted her ability to perform work, Dr. Chiu stated that Mou "stopped working since 2005 as she struggles with symptoms of depression & panic attacks." *Id.*  Similarly, as discussed above, Dr. Chiu explained or based many of her medical findings as to the severity of Mou's mental impairments on symptoms beginning in 2005.

### c.   Dr. Mohammed's Medical Expert Testimony

During the January 21, 2014 supplemental administrative hearing, discussed in more detail in the following section, Dr. Shakil Mohammed testified as an impartial medical expert.  *See id.* at 102–10.  At the outset, Dr. Mohammed explained that he did not directly examine or treat Mou, that he did not know Mou personally, and that his medical conclusions were solely based on his review of the record.  *Id.* at 102–03.  Dr. Mohammed concluded that Mou had two medically determinable impairments which met listing criteria—12.04 major depressive disorder and 12.06 panic disorder and post-traumatic stress disorder ("PTSD").  *Id.* at 103.  In coming to this conclusion, Dr. Mohammed emphasized the significance of the medical findings contained within Dr. Chiu's medical source statement (Exhibit 5F, *id.* at 277−81), Dr. Chiu's treatment notes (Exhibit 6F, *id.* at 282−311), and Dr. Leith's consultative psychiatrist examination (Exhibit 8F, *id.* at 330−42).  *Id.* at 104.  Dr. Mohammed also indicated that, while Dr. Chiu found marked limitations to social functioning and daily living, Dr. Mohammed's own opinion is moderate to marked limitations in these areas.  *Id.*  Dr. Mohammed also saw "no particular social decompensation" in Mou.  *Id.*  Dr. Mohammed did not explain his basis for differing from Dr. Chiu's own impressions of marked limitations in these areas or how his assessment of moderate to marked limitations satisfies the statutory Paragraph B criteria.  *Id.* at 104–05.

Following this testimony, the ALJ questioned Dr. Mohammed on his basis for his opinions given that there are no mental health records between that provided by Dr. Leith in 2007 and those provided by Dr. Chiu in 2012.  *Id.* at 105.  The ALJ's concerns with this gap in medical evidence are apparent from her questioning of Dr. Mohammed:

So we would need to have some information, would we not, in order to determine what her condition was?  I mean if it was six months apart or a year or less, I can see a connection between the two.  But five years is kind of a long time.  So people's conditions can change over time.  So wouldn't we need to know what she was doing during those five years?

*Id.* at 106.  Dr. Mohammed responded by stating Dr. Leith's records from 2007 indicate that Mou was unable to work at the time and that she had developed PTSD and a panic disorder after the incident in 2005.  *Id.* at 107–08.  The ALJ rebutted, "[b]ut how do we know what her condition was like and what she was doing and not doing and what she was able to do and not able to do if there are no records for that five-year period?"  *Id.* at 108.  Dr. Mohammed reiterated his conclusions regarding PTSD and the panic disorder, as well as that it is his opinion "that with those two diagnoses and what was going on, that she really couldn't work," but conceded that he did not "have any documents" regarding the intervening period.  *Id.*

Mou's attorney briefly questioned Dr. Mohammed at the hearing, asking him whether the symptoms described in medical reports from Dr. Leith in 2007 were similar to those noted by Dr. Chiu in 2012.  *Id.* at 107–08.  Dr. Mohammed mentioned that Dr. Chiu described in detail indications of social isolation in Mou that were not included in Dr. Leith's statement from 2007.  *Id.* at 108.  Mou's attorney then asked whether it would be consistent with PTSD to have difficulty seeking help in the form of psychiatric treatment to which Dr. Mohammed responded, "Not necessarily.  It depends on the person."  *Id.*

d.   Dr. Yeh's Medical Notes

The record includes little medical evidence relating to Mou's mental and emotional struggles beyond the statements by Dr. Leith, Dr. Chiu, and Dr. Mohammed.  In medical records from Mou's treating physician, Dr. George Yeh, dated between June 2006 and August 2013, Dr. Yeh mentions virtually nothing in his notes regarding mental or emotional issues affecting Mou.  *See id.* at 258–68, 313–329.  Dr. Yeh's medical notes largely focus on Mou's physical symptoms or lack thereof between 2006 and 2013, which Mou's present motion does not contend give rise to a finding disability.  *See generally id.* at 312–29.  Dr. Yeh does note, however, that Mou exhibited heightened stress on January 25, 2007, *id.* at 328, that Mou was not active, not sleeping well, and

depressed on July 17, 2008, *id.* at 260, and that he provided prescriptions to Mou for the antidepressant Paxil in July 2008 and later between October 2012 and August 2013, *id.* at 260, 322–23.

### C.   The Administrative Hearings

#### 1.   The October 10, 2013 Hearing

On October 7, 2013, Mou filed a pre-hearing brief for the October 10, 2013 administrative hearing before Administrative Law Judge Frederick C. Michaud. *See id.* at 239–44. In this brief, Mou claimed that she was severely impaired by PTSD and Major Depressive Disorder warranting a finding of disability under the five-step analysis used pursuant to the Social Security Act, with an onset date of December 10, 2005. *Id.* at 240. Under this analysis, Mou claimed that because she was not engaged in substantial gainful activity after her onset date, because she was severely impaired, and because she was unable to perform work, Mou's impairments should be deemed disabilities under the Social Security Act. *Id.* at 241–44. In her pre-hearing brief, Mou notably contended she did not have any impairment or combinations of impairments equal to or exceeding statutory definitions under step three of the five-step analysis. *Id.* at 242.

At the October 10, 2013 administrative hearing, Judge Michaud questioned Mou and her attorney, Ashley Meyers, regarding Mou's disability claim. *Id.* at 128–35. Judge Michaud began his examination of Mou by establishing her education and work history. Mou explained that she had obtained a master's degree in computer systems but she had not worked since 2005. *Id.* at 131. Mou explained that her most recent work experience was as a system or business analyst. *Id.*

During the hearing, Judge Michaud indicated he was underwhelmed by the relevancy of Mou's medical records from Dr. Yeh submitted to the Court for the proceeding. *Id.* Meyers opined that Yeh's records were mostly useful in that they indicate Yeh prescribed Paxil, an anti-depressant, for Mou on July 18, 2008. *Id.* Meyers also revealed there were psychiatric evaluations made for Mou in anticipation of Mou's prior civil rights lawsuit that had not been previously introduced in the administrative proceedings. *Id.* at 131–32. Judge Michaud agreed with Meyers that the hearing should be rescheduled for a later date to allow for the submission and consideration of these psychiatric evaluations, thus concluding the October 10, 2013 hearing. *Id.*

United States District Court
Northern District of California

14

at 132–34.

## 2.  The January 21, 2014 Hearing

Following the October 10, 2013 hearing, a supplemental hearing was set for January 21, 2014.  The January 21, 2014 hearing was originally to be heard by Judge Michaud, but later was reassigned to Administrative Law Judge Brenton L. Rogozen due to a scheduling conflict.  *See id.* at 254.  On January 15, 2014, Mou submitted a pre-hearing brief attaching Dr. Leith's psychological assessment as an exhibit for the supplemental hearing.  *Id.* at 251.  In this briefing, Mou claimed the Dr. Leith's medical opinions were consistent Dr. Chiu's opinions, reflecting a consistency in the severity and presence of PTSD and depression symptoms in Mou since the alleged onset date.  *Id.* at 252.  Mou submitted an additional pre-hearing brief on January 21, 2014, objecting to the last minute reassignment of the matter to Judge Rogozen and requesting a postponement of the hearing to a future date with a reassignment of the case back to Judge Michaud.  *Id.* at 254.

At the January 21, 2014 supplemental hearing, the ALJ, Judge Rogozen, began the hearing despite Mou's objections to the last minute reassignment of the matter to him.  At the hearing, Mou, Dr. Mohammed (the medical expert), and Kenneth Ferra[3] (a vocational expert) provided testimony related to Mou's disability claims.  *See generally id.* at 98–127.

Meyers and the ALJ questioned Dr. Mohammed in his capacity as a medical expert.  *Id.* at 102–10.  Dr. Mohammed had not previously met with or discussed the matter with Mou and based his analysis and medical opinions solely on his review of the record.  *Id.* at 102.  As discussed above in greater detail, Dr. Mohammed concluded that Mou had depression meeting the criteria of Listing 12.04 and anxiety meeting the criteria of Listing 12.06 as supported by his review of the record.  *Id.* at 103.  Dr. Mohammed also stated that in light of the medical opinions by Dr. Chiu and Dr. Leith regarding Mou's mental state in 2005, his opinion was "that with those two diagnoses and what was going on, that she really couldn't work."  *Id.* at 108.

---

[3] Ferra's name is sometimes spelled "Farah" in the record.  *See, e.g.*, AR at 120 (transcript of administrative hearing); *but see id.* at 48 (letter to Kenneth Ferra requesting his testimony as a vocational expert at the hearing).

United States District Court
Northern District of California

Meyers and the ALJ asked Mou to discuss her own impressions of her emotional state immediately following the King Library events. *Id.* at 111–120. Mou stated she would cry constantly for a period of about two years following the King Library events and that her divorce was a direct result of the events and her subsequent reaction. *Id.* at 111–13. According to Mou:

> I spend at least two years crying at home all day long because I have to went [sic] through all this. And I could not function, my brain could not function. I could not do anything. I could not eat properly, I could not cook, I could not even face myself. I have to go to Salvation Army to eat. I used to cook. I used to cook a lot. But I lost it. I could not do anything. I just cry all day long.

*Id.* at 112. Mou explained that despite her constant emotional turmoil resulting from the events, she did not see a psychiatrist around the time of the King Library events due to her ex-husband's general refusal to take Mou to a psychiatrist and the Chinese cultural belief "that unless that person went over 100 percent crazy it's really not [sic] to see the psychiatrist." *Id.* at 113. Mou eventually started seeing Dr. Chiu in 2012 because "somebody suggested [it] and [she saw herself] not recovering, not going anywhere." *Id.*

When Meyers asked Mou why she would have difficulty with a less stressful job where she wasn't working around others, Mou responded that she did not think there was a job like that available because, in her words, "[n]obody likes me, nobody cares about me, and nobody cares about my rides [sic]. That's pretty much there's no exceptions." *Id.* at 114–15. Mou testified that she no longer had friends despite being called a "social bird" in the past, that she could no longer concentrate and focus following the King Library events, and that her PTSD had worsened since 2007 as a result people mistreating her when she goes out. *Id.* at 115–16. Mou also stated that the medications she was taking at the time of the hearing did not do anything for her in limiting her symptoms. *Id.* at 117. At the time of the hearing, Mou stated she was no longer able to keep her apartment clean as she slowly lost the concentration necessary to make her mind up and determine what to do around the house. *Id.* at 117–18.

When questioned by the ALJ, Mou detailed her day-to-day life following the King Library events. Mou stated she was currently using her settlement from the civil lawsuit surrounding the King Library events to pay for her rent. *Id.* at 118–19. Mou lost the ability to go grocery

shopping and cook over time, which led to her husband doing her grocery shopping prior to the settlement of the lawsuit as well as Mou more frequently going to Salvation Army for free meals. *Id.* at 119.  Because she does not drive, Mou took the train to Salvation Army, and generally only ate one meal a day.  *Id.* at 119–20.

The vocational expert, Ferra, testified regarding his opinions of Mou's relevant past work experience and future job prospects.  *See id.* at 122–26.  Ferra stated that Mou's relevant past work experiences were as a program analyst and systems analyst, both classified as sedentary and skilled in nature.  *Id.* at 122.  Ferra stated that while even a large restriction on speaking with the public (limited to up to 5% of the workday) would not restrict Mou's ability to perform past jobs, a similar restriction on communication with co-workers and supervisors would prevent Mou from performing those jobs.  *Id.* at 123–24.  Ferra noted that if Mou had a less severe restriction to communication with co-workers and supervisors (limited to up to 33% of the workday), there would be jobs that could accommodate this restriction.  *Id.* at 124.

In responding to the ALJ's hypothetical, Ferra then stated he did not believe a hypothetical individual who "is less than 50 years of age, with more than a high school education, college educations, prior work that was similar to the claimant here . . . that would need a job that's unskilled and would have rare contact with either the public or co-workers and supervisors" would be able to find jobs on the national economy.  *Id.* at 124.  Ferra explained there were no jobs on the national market for this hypothetical individual because "we're restricting the access to the co-workers and the supervisors to an extreme that would not be practical," while reiterating that jobs would likely be available to a hypothetical individual with a less extreme restriction of one-third of the day for communications with co-workers.  *Id.*  With this less extreme restriction, Ferra listed assembler, cleaner, and packing line worker as examples of unskilled jobs that a hypothetical individual could perform.  *Id.* at 125.  However, Ferra reiterated that all of the available jobs would require about one-third of the day contact with other people, and a more extreme limitation would make these jobs unfeasible.  *Id.*  Meyers posed an additional factor to the hypothetical of "somebody who would have difficulty responding appropriate to criticism from a supervisor," which Ferra described as likely unquantifiable, concluding this behavior would only

affect his analysis if it impacts the ability to complete job-related tasks.  *Id.* at 126.

### D.    ALJ Analysis and Findings of Fact

Prior to resolving the substantive legal analysis regarding Mou's disability claims, the ALJ rejected Mou's objections to the reassignment of the matter from Judge Michaud to Judge Rogozen.[4]  Mou's present motion does not contend that improper reassignment of the matter is grounds for reversal.

#### 1.    Legal Standard for Disability Analysis

##### a.   Five-Step Analysis

Disability insurance benefits are available under the Social Security Act when an eligible claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 423(a)(1).  A claimant is only found disabled if his physical or mental impairments are of such severity that he is not only unable to do his previous work but also "cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).  The claimant bears the burden of proof in establishing a disability.  *Gomez v. Chater*, 74 F.3d 967, 970 (9th Cir.), *cert. denied*, 519 U.S. 881 (1996).

The Commissioner has established a sequential five-part evaluation process to determine whether a claimant is disabled under the Social Security Act.  20 C.F.R. § 404.1520(a).  At Step One, the Commissioner considers whether the claimant is engaged in "substantial gainful activity."  20 C.F.R. § 404.1520(a)(4)(I).  If she is, the Commissioner finds that the claimant is not disabled, and the evaluation stops.  If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to Step Two to consider whether the claimant has "a severe medically

---

[4] In support of denying Mou's reassignment objections, the ALJ explained that Judge Michaud "postponed the hearing to give the claimant additional time to submit psychological evaluations from prior to the claimant's date last insured," and that "the record does not indicate that the previous ALJ 'heard' the case or that he was prepared to 'issue the decision' having heard the case."  *Id.*

United States District Court
Northern District of California

determinable physical or mental impairment," or combination of such impairments, which meets the duration requirement in 20 C.F.R. § 404.1509.  An impairment is severe if it "significantly limits [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  If the claimant does not have a severe impairment, disability benefits are denied at this step.  If one or more impairments are severe, the Commissioner will next perform Step Three of the analysis, comparing the medical severity of the claimant's impairments to a compiled listing of impairments that the Commissioner has found to be disabling.  20 C.F.R. § 404.1520(a)(4)(iii). If one or a combination of the claimant's impairments meet or equal a listed impairment, the claimant is found to be disabled.  Otherwise, the Commissioner proceeds to Step Four and considers the claimant's residual functional capacity ("RFC") in light of her impairments and whether she can perform past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv); 20 C.F.R. § 404.1560(b) (defining past relevant work as "work . . . done within the past 15 years, that was substantial gainful activity, and that lasted long enough for you to learn to do it").  If the claimant can still perform past relevant work, she is found not to be disabled.  If the claimant cannot perform past relevant work, the Commissioner proceeds to the fifth and final step of the analysis. 20 C.F.R. § 404.1520(a)(4)(v).  At Step Five, the burden shifts to the Commissioner to show that the claimant, in light of her impairments, age, education, and work experience, can perform other jobs in the national economy.  *Johnson v. Chater*, 108 F.3d 178, 180 (9th Cir. 1997).  A claimant who is able to perform other jobs that are available in significant numbers in the national economy is not considered disabled, and will not receive disability benefits.  20 C.F.R. § 404.1520(f). Conversely, where there are no jobs available in significant numbers in the national economy that the claimant can perform, the claimant is found to be disabled.  *Id*.

### b.  Mental Impairment Analysis

Where there is evidence of a mental impairment that allegedly prevents a claimant from working, the Social Security Administration has supplemented the five-step sequential evaluation process with additional regulations to assist the ALJ in determining the severity of the mental impairment.  *Clayton v. Astrue*, 2011 WL 997144, at *3 (E.D. Cal. Mar. 17, 2011) (citing 20 C.F.R. §§ 404.1520a, 416.920a).  These regulations provide a method for evaluating a claimant's

United States District Court
Northern District of California

pertinent symptoms, signs, and laboratory findings to determine whether the claimant has a medically determinable mental impairment.  20 C.F.R. § 404.1520a(a).  In conducting this inquiry, the ALJ must consider all relevant and available clinical signs and laboratory findings, the effects of the claimant's symptoms, and how the claimant's functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment. 20 C.F.R. § 404.1520a(c)(1).  The ALJ must then assess the degree of the claimant's functional limitations based on the individual's impairments.  20 C.F.R. § 404.1520a(c)(2).

Although analysis under 20 C.F.R. § 404.1520a includes an assessment of the individual's limitations and restrictions, this is not a residual functional capacity assessment but rather a component of analyzing the severity of mental impairments at Steps Two and Three of the sequential evaluation process.  SSR 96-8p.  The mental residual functional capacity assessment used at Steps Four and Five requires a more detailed assessment in which the ALJ must address the various functions contained in the broad categories found in Paragraph B of the adult mental disorders listed in 12.00 of the Listing of Impairments.  *Id*.  The listings that are relevant to Mou's claimed mental disabilities are 12.04 and 12.06.

Disorders related to depression are governed by Listing 12.04, for affective disorders.  That listing provides in relevant part:

> Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.
>
> The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.
>
> A.  Medically documented persistence, either continuous or intermittent, of one of the following:
>
> > 1. Depressive syndrome characterized by at least four of the following:
> >
> > > a. Anhedonia or pervasive loss of interest in almost all activities; or
> > >
> > > b. Appetite disturbance with change in weight; or
> > >
> > > c. Sleep disturbance; or

United States District Court
Northern District of California

d. Psychomotor agitation or retardation; or

e. Decreased energy; or

f. Feelings of guilt or worthlessness; or

g. Difficulty concentrating or thinking; or

h. Thoughts of suicide; or

i. Hallucinations, delusions, or paranoid thinking; or

[subparts A.2 and A.3 discuss symptoms of manic or bipolar syndromes];

AND

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration;

OR

C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or

2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. § 404, Subpt. P, App. 1.  Listing 12.06, for anxiety-related disorders, provides as follows:

In these disorders anxiety is either the predominant disturbance or it is experienced if the individual attempts to master symptoms; for

21

example, confronting the dreaded object or situation in a phobic disorder or resisting the obsessions or compulsions in obsessive compulsive disorders.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in both A and C are satisfied.

A. Medically documented findings of at least one of the following:

    1. Generalized persistent anxiety accompanied by three out of four of the following signs or symptoms:

        a. Motor tension; or

        b. Autonomic hyperactivity; or

        c. Apprehensive expectation; or

        d. Vigilance and scanning; or

    2. A persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; or

    3. Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or

    4. Recurrent obsessions or compulsions which are a source of marked distress; or

    5. Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress;

AND

B. Resulting in at least two of the following:[5]

    1. Marked restriction of activities of daily living; or

    2. Marked difficulties in maintaining social functioning; or

    3. Marked difficulties in maintaining concentration, persistence, or pace; or

    4. Repeated episodes of decompensation, each of extended duration.

OR

---

[5] Paragraph B of Listing 12.06 is identical to Paragraph B of Listing 12.04. As discussed below, the ALJ analyzed these together as the "Paragraph B criteria."

United States District Court
Northern District of California

C. Resulting in complete inability to function independently outside the area of one's home.

*Id.* Where the listings refer to "marked" limitations, "it means more that moderate but less than extreme. A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with [the claimant's] ability to function independently, appropriately, effectively, and on a sustained basis." *Id.* at 12.00C.

### 2. ALJ's Application of Five-Factor Test

#### a. Step One: Substantial Gainful Activity

The ALJ began his analysis by concluding that Mou did not work between the alleged onset date (December 10, 2005) and her date of last insured (December 31, 2008), satisfying step one of the analysis. AR 15. Because Mou was not engaged in substantial gainful activity during the relevant period, the ALJ proceeded to step two of the analysis.

#### b. Step Two: Severe Impairments

Under step two of the five-factor test, the ALJ concluded that, "[t]hrough the date of last insured, the claimant had the following severe impairments: major depressive disorder and anxiety disorder." *Id.* (capitalization altered throughout). The ALJ found that "[t]hese impairments are established by the medical evidence and are 'severe' within the meaning of the Regulations because they are more than a slight abnormality or combination of abnormalities that cause the claimant more than minimal functional limitations." *Id.* The ALJ did not identify the portions of the record he relied on in coming to this conclusion regarding Mou's mental impairments. *See id.*

The ALJ also reviewed the medical records of Dr. George Yeh, M.D., Mou's primary care physician during the relevant period, to determine whether any of listed physical impairments are severe under the regulations. *Id.* at 15–16. The ALJ concluded that all listed physical impairments in Mou's medical records were nonsevere in nature, thus failing to satisfy the requirements under the step two analysis. *Id.* at 16. Mou does not contest this conclusion. *See generally* Pl.'s Mot.

c.   Step Three: Medical Severity

Following his finding that Mou had severe depression and anxiety during the relevant period, the ALJ held that neither of these mental impairments meet or exceed the criteria detailed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* at 16.  Specifically, the ALJ found that Mou's impairments failed to meet the standards articulated under Paragraph B and Paragraph C of the listings for depression and anxiety. *Id.*  Because either Paragraph B or Paragraph C criteria must be met under Listings 12.04 (governing depression) and 12.06 (governing anxiety), and those criteria are identical for both listings, the ALJ analyzed these criteria for both depression and anxiety collectively, and ultimately concluded that Mou's impairments did not satisfy either listing. *Id.*

The ALJ concluded Mou did not satisfy at least two of the "Paragraph B" criteria, as required for the listing for either depression or anxiety, in that Mou (1) was not markedly restricted in activities of daily living, (2) was not markedly restricted in maintaining social functioning, (3) was not markedly restricted in maintaining concentration, persistence, or pace, and (4) did not have repeated episodes of decompensation. *Id.* at 16–17.

Because the listings for depression and anxiety can alternatively be established with the presence of "Paragraph C" decompensation criteria in the absence of "Paragraph B" criteria, the ALJ next considered whether Mou's claimed disabilities satisfied "Paragraph C" criteria.  The ALJ concluded, "the evidence fails to establish the presence of the 'paragraph C' criteria," because

> The evidence of record does not indicate that the claimant has suffered three episodes of decompensation within 1 year, or an average of once every four (4) months, each lasting for at least two (2) weeks; or suffers from a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or has a current history of one (1) or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

*Id.* at 17.

Because the ALJ concluded that Mou failed to establish either Paragraph B or Paragraph C criteria with respect to her severe mental impairments, the ALJ held that Mou's mental

1    impairments did not meet or exceed the listing definitions for depression or anxiety under the step

2    three analysis.  The ALJ thus proceeded to a residual functional capacity assessment to determine

3    Mou's ability to perform past relevant work or other jobs in the national economy.

4              d.   Step Four: Residual Functional Capacity and Past Relevant Work

5              With respect to Mou's residual functional capacity to perform work during the relevant

6    period, the ALJ concluded:

7              After careful consideration of the entire record, the undersigned
       finds that, through the date last insured, the claimant had the residual
8              functional capacity to perform a full range of work at all exertional
       levels but with the following nonexertional limitations: is limited to
9              semi-skilled work and occasional contact with the public, co-
       workers or supervisors where occasional is defined as up to one
10             third of the workday.

11   *Id.* at 17.  To reach this conclusion, the ALJ applied a two-step process to analyze Mou's

12   symptoms.  *Id.*  First, it must "be determined whether there is an underlying medically

13   determinable physical or mental impairment(s)."  *Id.*  "Second, once an underlying physical or

14   mental impairment(s) that could reasonably be expected to produce the claimant's pain or other

15   symptoms has been shown, the undersigned must evaluate the intensity, persistence, and limiting

16   effects of the claimant's symptoms to determine the extent to which they limit the claimant's

17   functioning."  *Id.* at 18.  "[W]henever statements about the intensity, persistence, or functionally

18   limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the

19   undersigned must make a finding on the credibility of the statements based on a consideration of

20   the entire case record."  *Id.*

21             With respect to the first part of this residual functional capacity analysis, the ALJ held

22   "that the claimant's medically determinable impairments could reasonably be expected to cause

23   the alleged symptoms."  *Id.* at 18.  For the second part, the ALJ held that "[b]ased on the

24   evaluation of Dr. Leith on August 24, 2007 and viewing the evidence in the light most favorable to

25   the claimant, the undersigned finds that the claimant has the capacity for at least semi-skilled

26   work."  *Id.* at 24.  In coming to this conclusion, the ALJ emphasized Mou's lack of credibility,

27   stating "the claimant's statements concerning the intensity, persistence and limiting effects of

28   these symptoms are not entirely credible for the reasons explained in this decision."  *Id.* at 18.

United States District Court
Northern District of California

25

Specifically, the ALJ held that "[a]llowing that her failure to seek treatment as recommended by Dr. Leith may, at least in part, be due to cultural factors, the lack of objective clinical and diagnostic findings supporting the claimant's allegations prior to her date last insured and her capacity to handle the rigors of a full class schedule in paralegal studies leaves the undersigned unable to accord more than partial credibility to the claimant." *Id.*

The ALJ began his analysis by looking to the medical record related to Mou's claims. First, the ALJ noted that while Dr. Yeh's medical notes include a report by Mou of sleeping poorly and a prescription for Paxil on June 6, 2008 and later on follow-up on July 18, 2008, Dr. Yeh's reports contain "no further complaints of depression of sleep disruption through August 20, 2013." *Id.* at 18–19. In evaluating Dr. Leith's medical statement from 2007, the ALJ seems to assign great weight to portions of the statement, such as Dr. Leith's finding that Mou's "depression has been inadequately treated by the Chinese medicine she prefers," and that Mou "would probably benefit from treatment with antidepressant medication and supportive psychotherapy," but fails to examine, analyze, or weigh the relevancy of many of Dr. Leith's other statements, including the ultimate finding of depression. *Id.* at 21−22.

With respect to the medical opinions of Dr. Mohammed and Dr. Chiu formed after the date last insured, the ALJ assigned them great weight as probative of Mou's level of mental and emotional functioning at the time the reports were made, but assigned them little to no weight as relevant to Mou's level of functioning during the relevant period from 2005 to 2008. *Id.* at 22–23. For Dr. Chiu's testimony, the ALJ "accorded this medical source statement great weight to the extent that it opines on the claimant's current level of functioning as of August 22, 2012 but little weight to the extent that it provides no insight as to the claimant's level of functioning as of December 10, 2005, her alleged onset date, or prior to December 31, 2008, her date last insured, and *is therefore essentially irrelevant to this determination*." *Id.* at 22 (emphasis added). For Dr. Mohammed's opinion, the ALJ stated that he "accords little weight to the opinion of the impartial medical expert to the extent that it extends prior to August of 2012 based on a single evaluation of the claimant in 2007 by Dr. Leith with no other supporting objective medical evidence." *Id.* at 23.

Following review of the record, the ALJ came to several residual functional capacity

United States District Court
Northern District of California

conclusions.  First, the ALJ concluded "the claimant is limited to only occasional contact with the public, coworkers or supervisors where occasional means up to one third of the workday." *Id.* at 23.  The ALJ noted that Dr. Leith's discussion of fear of going out and being arrested was generally targeted at the King library, and not the public as a whole, as evidenced by Mou's ability to go to paralegal classes full time, utilize public transportation, go to movies alone or with friends, and perform other work or chores. *Id.*  Second, the ALJ found that Mou's above-average intelligence, capacity for abstract thinking, orientation to time, place, person, and situation, and capacity to attend college level courses on a full time basis indicate that she had a capacity for at least semi-skilled work. *Id.* at 24.  "In sum, the above residual functional capacity assessment is supported for the period prior to the claimant's date last insured of December 31, 2008 by the psychological evaluation of Dr. Leith dated August 24, 2007, the claimant's reported level of functioning and the record taken as a whole." *Id.*

Step four also includes an analysis of whether a claimant is able to perform past relevant work.  Because the "above residual functional capacity contemplates work at the semi-skilled level," Mou's residual functional capacity "precludes the claimant's prior relevant work performed at the skilled level." *Id.* at 24.  "Accordingly, the claimant was unable to perform past relevant work." *Id.*

e.  Step Five: Ability to Perform Other Jobs in National Economy

Under step five, the ALJ considered, taking into account Mou's age, education, work experience, and residual functional capacity, whether there was a significant number of jobs in the national economy Mou could have performed. *See id.* at 25.  At the January 21, 2014 hearing, the ALJ asked the vocational expert whether there were jobs available for individuals with Mou's age, education, work experience, and a residual functional capacity for unskilled work with only occasional interactions with the general public, co-workers, and supervisors. *Id.*  The vocational expert pointed to three jobs that met these parameters—assembly, cleaner, and packing line worker. *Id.*  Because "[w]ork at the semi-skilled level, as permitted in the above residual functional capacity, includes the capacity to perform work at the unskilled level," the ALJ deemed these jobs to be applicable to Mou. *Id.*  The ALJ thus concluded that there was work available to

27

Mou in significant numbers in the national economy to satisfy a finding of non-disability under step five. *Id.* at 26.

Because the ALJ concluded that Mou's residual functional capacity allowed for semi-skilled work with only occasional interactions with co-workers, and because ALJ adopted the vocational expert's findings that there were jobs meeting these parameters that were adequately available in both the California and national economies, the ALJ came to his ultimate conclusion that Mou "was not under a disability, as defined in the Social Security Act, at any time from December 10, 2005, the alleged onset date, through December 31, 2008, the date last insured." *Id.* at 26.

### E. Motions for Summary Judgment

#### 1. Mou's Motion for Summary Judgment

Mou filed a complaint seeking review of the ALJ's decision and subsequently moved for summary judgment on three grounds— (1) that the ALJ violated SSR 83-20 and related authority by discrediting Dr. Mohammed's retrospective opinions through the ALJ's requirement of contemporaneous treatment or medical evidence, (2) that the ALJ erroneously evaluated Dr. Chiu's retrospective opinions, and (3) that ALJ failed to provide clear and convincing reasons for finding Mou not credible in part. Pl.'s Mot. (dkt. 17) at 8, 11, 15.

First, Mou contends that "when evaluating medical expert Dr. Mohammed's retrospective opinion, the ALJ violated SSR 83-20 and related authority," in that "there is no legal requirement for contemporaneous treatment or medical findings during a period for a claimant to be found disabled during that period during which disability is alleged or there be any objective medical evidence during that period." Pl.'s Mot. at 8 (capitalization altered throughout) (citing SSR 83-20). Specifically, Mou argues that a "claimant may properly be found disabled solely upon a retrospective evaluation of a period during which the claimant received no medical treatment whatsoever." *Id.* at 9. Mou states that the ALJ committed legal error in finding dispositive "the absence of objective medical evidence after Dr. Leith's mid-2007 examinations until Mou's treatment with psychologist Dr. Chiu in August 2012." *Id.* at 10. Mou goes on to state that because the ALJ correctly did not dispute Mou's inability to work as of August 2012 (when she

began receiving psychological treatment from Dr. Chiu), and because the ALJ did not determine that Mou's condition worsened since her date last insured, the later psychological evaluations by Dr. Mohammed should have been found probative of Mou's condition prior to her date last insured. *See id.* at 11. Mou concludes that "[t]he ALJ's violation of SSR 83-20 — his requirement for contemporaneous treatment and/or objective medical evidence — was harmful," and that "[t]he ALJ's legal error is the main justification of his rejection of Dr. Mohammed's retrospective opinion." *Id.* On these grounds, Mou urges this Court to find Mou clearly disabled prior to her date last insured under step three or to remand for a proper evaluation of Dr. Mohammed's retrospective opinion. *Id.*

Second, Mou contends "the ALJ erroneously evaluated treating psychologist Dr. Chiu's retrospective opinions." *Id.* at 11. (capitalization altered throughout). Specifically, Mou argues the ALJ is required to present clear and convincing reasons for rejecting the uncontroverted opinion of a claimant's treating source, which Dr. Chiu was at the time of treatment. *Id.* Mou claims that Dr. Chiu's uncontroverted opinion demonstrates that Mou was substantially more restricted than the ALJ found, ultimately invalidating the ALJ's assessment "that Ms. Mou could perform semi-skilled work with occasional contact with the public, co-workers, and supervisors." *Id.* at 13. Mou contends, as with the ALJ's analysis of Dr. Mohammed, that the ALJ erroneously failed to understand Dr. Chiu's opinions as retrospective, that this failure was harmful, and that the ALJ failed to allege Mou's condition worsened in a matter that would minimize the applicability of Dr. Chiu's findings to Mou in the relevant period. *Id.* at 13–14.

Third, Mou argues "the ALJ did not provide clear and convincing reasons for finding Ms. Mou not credible." *Id.* at 15. (capitalization altered throughout). In light of the ALJ's evaluation that Mou's culture played a role in her not getting mental health treatment prior to date last insured, the ALJ's failure to allege there was significant worsening in Mou's symptoms, and erroneous evaluation of medical records, Mou claims that the ALJ improperly discredited her testimony as to the severity of her symptoms. *Id.* at 15–16. Further, Mou contends that because "[t]he ALJ accorded 'great weight' to Dr. Chiu's June 2013 opinion that Ms. Mou was markedly limited in many areas," the ALJ could not rationally "agree[] with Dr. Chiu's purported opinions

1    about Ms. Mou's condition 'since August 22, 2012' and find Ms. Mou not credible during the

2    period during which she was treated by Dr. Chiu." *Id.* at 16.

3                    **2.   Commissioner's Opposition and Cross-Motion for Summary Judgment**

4            In response to Mou's Motion for Summary Judgment, the Commissioner filed an

5    opposition and cross-motion for summary judgment requesting this Court uphold the

6    Commissioner's denial of benefits "because it was both supported by substantial evidence and free

7    from legal error," or, alternatively, remand for further administrative proceedings.  Def.'s Mot.

8    (dkt. 18) at 10.  The Commissioner presents two overarching arguments in support of its cross-

9    motion for summary judgment: (1) "the ALJ's interpretation of medical evidence was rational and

10   entitled to deference"; and (2) "the ALJ supported his credibility findings with substantial

11   evidence and applied the correct legal standards." *Id.* at 3, 6 (capitalization altered throughout).

12           As an initial matter, the Commissioner claims that even if Mou could otherwise establish a

13   disability in the relevant time period, she would be unable to collect any benefits because "the

14   earliest date a Plaintiff can receive [disability insurance benefits] is no earlier than the seventeenth

15   month preceding the month in which she applied." *Id.* at 2 (citing 20 C.F.R. § 404.315(a)(4)).  In

16   this instance, "the earliest date Plaintiff would have been eligible to receive [disability insurance

17   benefits], if she could have established disability, would have been August 2010." *Id.*  Further, the

18   Commissioner contends that for those who apply after expiration of insured status, claimants must

19   establish that their disability currently exists and continuously existed from a date prior to lapse of

20   insurance to the date of their application.  *Id.*

21           With respect to the ALJ's analysis of the medical evidence, the Commissioner claims that

22   "the ALJ properly evaluated conflicting medical evidence by summarizing it in detail and

23   interpreting it."  Def.'s Mot. at 4 (citing AR 15–23).  The Commissioner claimed that "[t]he ALJ's

24   reasoning set forth in his nearly 8-page discussion of the medical evidence provides sufficient

25   guidance for this Court to draw inferences as to why the ALJ rejected the more restrictive medical

26   opinions and Plaintiff's subjective complaints in assessing her credibility." *Id.*  With respect to the

27   ALJ's rejection of the purportedly retrospective aspects of Dr. Chiu's opinions, the Commissioner

28   stated, "[w]hen a Plaintiff has more than one treating physician, the ALJ can choose to accept the

United States District Court
Northern District of California

30

substantiated opinion of one or more of them over the unsubstantiated opinion of another." *Id.* at 5. Even if you classify Dr. Chiu's opinion as retrospective, the Commissioner claims, "his basis for this 'retrospective' opinion is Plaintiff's self-reports, which are contradicted by her reports to Dr. Yeh and her activities of daily living during the period.[6]" *Id.* The Commissioner contends "the ALJ's rejection of Dr. Mohammed's 'retrospective' opinion, which was based upon Dr. Chiu's opinion that was premised upon Plaintiff's self-reports . . . was supported by substantial evidence and free of harmful legal error." *Id.* (citing *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012)). The Commissioner concludes by stating, "[t]he record contains conflicting medical evidence and, in such a situation, a reviewing court should defer to the ALJ's interpretation. Substantial evidence in the record supports The [sic] ALJ's reasoning, and therefore her decision should be affirmed." *Id.* at 7 (internal citations omitted).

Regarding the ALJ's decision to only partially credit Mou's testimony, the Commissioner argues, "the ALJ supported his credibility findings with substantial evidence and applied the correct legal standards." *Id.* at 6 (capitalization altered throughout). The Commissioner contends the ALJ's statements about Mou's daily activities, such as attending college, making meals, and using public transportation, are valid reasons for the ALJ to call into question Mou's credibility. *Id.* at 7. The Commissioner also points to the ALJ's consideration of lack of objective medical evidence prior to the date last insured and Mou's refusal to take recommended prescriptions as additional reasons why the ALJ properly questioned the credibility of Mou's testimony in his analysis and review of the record. *Id.* at 8. In sum, the Commissioner contends, "the ALJ's decision followed a logical sequence and established his reasons for rejecting Plaintiff's testimony which were based on his analysis of the entire record," and is therefore entitled great weight. *Id.* at 9. The Commissioner therefore "requests this Court affirm the Commissioner's decision because it was both supported by substantial evidence and free from legal error." *Id.* at 10

---

[6] The Commissioner specifically identifies several activities falling within the relevant period, including "taking 12 credits in paralegal course at West Valley College, going to karate classes, going to the movies by herself, or with friends; and the ability to use public transportation." Def.'s Mot. at 5.

1    (quoting *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005)).

2    **3.  Mou's Reply**

3    In her reply, Mou takes issue with several of the Commissioner's arguments while also

4    reiterating the bases for her requested relief.  Mou states that the Commissioner's contention that

5    the ALJ found Mou's condition to have deteriorated was a baseless and improper post hoc

6    rationalization on the Commissioner's part.  Pl.'s Reply (dkt. 20) at 2–3.  Instead, Mou contends

7    the ALJ did not allege worsening and therefore the retrospective opinions on record are relevant to

8    Mou's symptoms while insured.  *See id.* at 3.  Mou also takes issue with the Commissioner's

9    suggestion that Mou would not be entitled to benefits because the application was filed three years

10   after the date last insured, stating "[t]he date of Ms. Mou's [disability insurance benefits]

11   application (January 6, 2012) is not an issue," and that "[t]he ALJ adjudicated Ms. Mou's claim of

12   disability through her December 31, 2008 date last insured."  *Id.*

13   Mou also claims that the Commissioner improperly invoked 20 C.F.R. § 404.1530, the

14   "failure-to-follow-prescribed-treatment regulation," to find Mou not disable under a theory that

15   "[t]he regulation states that '[i]n order to get benefits, you must follow treatment prescribed by

16   your physician if this treatment can restore your ability to work.'"  *Id.* at 7 (second alteration in

17   original).  Mou argues that because she was not formally deemed disabled, this requirement would

18   not apply to her.  *Id.* (citing *Orn v. Astrue*, 495 F.3d 625, 637 (9th Cir. 2007)).  Mou also contends

19   that her education and daily activities should not be used to discredit her during a window of time

20   where the ALJ assigned "great weight" to Dr. Chiu's and Dr. Mohammed's opinion insofar as

21   they relate to Mou's symptoms in 2012.  *Id.* at 8.

22   **III.   ANALYSIS**

23   **A.   Legal Standard Under 42 U.S.C. § 405(g)**

24   When asked to review the Commissioner's decision, the Court takes as conclusive any

25   findings of the Commissioner which are free from legal error and supported by "substantial

26   evidence."  42 U.S.C. § 405(g).   Substantial evidence is "such evidence as a reasonable mind

27   might accept as adequate to support a conclusion," and it must be based on the record as a whole.

28   *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  Substantial evidence means "more than a mere

*United States District Court*
*Northern District of California*

1   scintilla," *id.*, but "less than a preponderance." *Desrosiers v. Sec'y of Health & Human Servs.*,

2   846 F.2d 573, 576 (9th Cir. 1988).   Even if the Commissioner's findings are supported by

3   substantial evidence, they should be set aside if proper legal standards were not applied when

4   weighing the evidence and in reaching a decision. *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir.

5   1978).  In reviewing the record, the Court must consider both the evidence that supports and

6   detracts from the Commissioner's conclusion. *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir.

7   1996) (citing *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985)).

8           If the Court identifies defects in the administrative proceeding or the ALJ's conclusions,

9   the Court may remand for further proceedings or for a calculation of benefits. *See Garrison v.*

10   *Colvin*, 759 F.3d 995, 1019−21 (9th Cir. 2014).

11           **B.**      **Relevance of Retrospective Medical Opinions by Dr. Chiu and Dr. Mohammed**

12           In evaluating Dr. Chiu's opinion, the ALJ "accorded this medical source statement great

13   weight to the extent that it opines on the claimant's current level of functioning as of August 22,

14   2012, but little weight to the extent that it provides no insight as to the claimant's level of

15   functioning as of December 10, 2005, [Mou's] alleged onset date, or prior to December 31, 2008,

16   her date last insured, and is therefore essentially irrelevant to this determination."  AR 22.

17   Similarly, the ALJ partially discounted Dr. Mohammed's testimony by according "great weight to

18   the testimony of the impartial medical expert to the extent that it is consistent with the medical

19   source statement of Dr. Chiu from August 22, 2012 to the date of the hearing," but assigned "little

20   weight to the opinion of the impartial medical expert to the extent that it extends prior to August

21   of 2012 based on a single evaluation of the claimant in 2007 by Dr. Leith with no other supporting

22   medical evidence." *Id.* at 23.  As detailed below, the Court finds the ALJ improperly failed to

23   consider the retrospective aspects of the medical opinions of both Dr. Chiu and Dr. Mohammed by

24   failing to provide clear and convincing evidence supported by substantial evidence that the

25   retrospective aspects of these opinions should be rejected in this manner.

26           **1.  Legal Standards for Opinions of Treating Physicians and Non-Examining**
             **Medical Experts**

27

28           "Cases in this circuit distinguish among the opinions of three types of physicians: (1) those

United States District Court
Northern District of California

who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)."[7] *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). "[T]he opinion of a treating physician is . . . entitled to greater weight than that of an examining physician, [and] the opinion of an examining physician is entitled to greater weight than that of a non-examining physician." *Garrison*, 759 F.3d at 1012.

"To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence ." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (citations omitted). The Ninth Circuit has recently emphasized the high standard required for an ALJ to reject an opinion from a treating or examining doctor, even where the record includes a contradictory medical opinion:

> "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." *Id.* This is so because, even when contradicted, a treating or examining physician's opinion is still owed deference and will often be "entitled to the greatest weight . . . even if it does not meet the test for controlling weight." *Orn v. Astrue*, 495 F.3d 625, 633 (9th Cir. 2007). An ALJ can satisfy the "substantial evidence" requirement by "setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Reddick* [*v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)]. "The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Id.* (citation omitted).
>
> Where an ALJ does not explicitly reject a medical opinion or set forth specific, legitimate reasons for crediting one medical opinion over another, he errs. See *Nguyen v. Chater*, 100 F.3d 1462, 1464 (9th Cir. 1996). In other words, an ALJ errs when he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion. *See id.*

---

[7] Psychologists' opinions are subject to the same standards as physicians' opinions. *See* 20 C.F.R. § 404.1527(a)(2); *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 692 (9th Cir. 2009) (applying standards discussing physicians' opinions to evaluate an ALJ's treatment of a psychologist's opinion).

United States District Court
Northern District of California

*Garrison*, 759 F.3d at 1012−13 (footnote omitted).

"The opinion of a nonexamining physician cannot by itself constitute substantial evidence that justified the rejection of the opinion of either an examining physician *or* a treating physician." *Lester*, 81 F.3d at 831.  Further, a "report of a non-examining, non-treating physician should be discounted and is not substantial evidence when contradicted by all other evidence in the record." *Gallant*, 753 F.2d at 1454.  However, in some cases a non-examining medical advisor's testimony may be used, in part, to reject the opinion of an examining or treating physician.  *See id.* at 831. "Opinions of a nonexamining, testifying medical advisor may serve as substantial evidence when they are supported by other evidence in the record and are consistent with it."  *Morgan v. Commissioner*, 169 F.3d 595, 600 (9th Cir. 1999).

Retrospective medical testimony may be considered where substantiated by medical evidence relevant to the period in question.  *See Johnson v. Shalala*, 60 F.3d 1428, 1433 (9th Cir. 1995).  In considering retrospective opinions, "medical evaluations made after the expiration of a claimant's insured status are relevant to an evaluation of the pre-expiration condition."  *Smith v. Bowen*, 849 F.2d 1222, 1225 (9th Cir. 1988).  "Medical reports are inevitably rendered retrospectively and should not be disregarded solely on that basis."  *Id.*  Further, given the continuity requirement for disability claims made after the expiration of insured status, "[t]he claimant may establish such continuous disabling severity by means of a retrospective diagnosis." *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1461 (9th Cir. 1995).  "For treating physicians who offer retrospective opinions on a claimant's disability, an ALJ may reject the opinion only if she provides clear and convincing reasons that are supported by the record as a whole."  *See id.* at 1432 (citing *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989); *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986)).

### 2.   The ALJ Erred in Failing to Credit Dr. Chiu's Retrospective Testimony as Treating Psychologist

As noted above, an ALJ must state clear and convincing reasons, supported by substantial evidence, to reject the uncontradicted opinion of a treating or examining doctor.  *See Ryan*, 528 F.3d at1198.  The ALJ failed to do this by using circular logic to color the record as contradicting

United States District Court
Northern District of California

1    Dr. Chiu's testimony and selectively failing to analyze the entire record. While Dr. Chiu specifies

2    an onset date in 2012, as noted by the ALJ, her findings following a year of treatment with Mou

3    directly tie the symptoms to 2005 when the King Library events occurred. These statements

4    comparing the 2012 symptoms with these 2005 events are uncontradicted by the record, and the

5    ALJ improperly found the statements to be irrelevant prior to 2012.

6          The ALJ's minimization of Dr. Chiu's medical statement is particularly notable where, as

7    here, the medical opinions housed within Dr. Chiu's statement are universally consistent with the

8    record. While the ALJ states Dr. Chiu's opinion "provides no insight as to the claimant's level of

9    functioning as of December 10, 2005, her alleged onset date, or prior to December 31, 2008, her

10   date last insured, and is therefore essentially irrelevant to this determination," *id.* at 22, the ALJ

11   fails to support this rejection of the retrospective portions of this opinion with clear and

12   convincing evidence supported by the record as a whole.

13         Although Dr. Chiu lists "August 22, 2012" as the alleged onset date in her Mental Medical

14   Source Statement, Dr. Chiu also stated that Mou's struggles with depression and panic attacks

15   were responsible for and substantiated by her inability to work since 2005. *Id*. at 278–80. The

16   ALJ failed to recognize the retrospective nature of several aspects of Dr. Chiu's analysis in

17   coming to her ultimate opinion. For example, in Dr. Chiu's discussion of the impact of Mou's

18   symptoms on her ability to work and the explanations for findings of marked or moderate

19   limitations to sustained concentration and persistence of understanding and memory, Dr. Chiu

20   points to Mou's inability to sustain or keep work since 2005 as a result of her symptoms. *Id.* at

21   278−80. Similarly, Dr. Chiu stated that Mou "stopped working since 2005 as she struggles with

22   symptoms of depression & panic attacks," indicating that Dr. Chiu viewed Mou's disability as

23   continuously dating back to 2005. *See id.* at 278. Because Dr. Chiu's statement discusses Mou's

24   symptoms throughout the years since the King Library incident as well as the role of depression

25   and panic attacks in preventing Mou from working since 2005, the ALJ's decision to find Dr.

26   Chiu's statement irrelevant to Mou's symptoms during the relevant period was improper.

27         The ALJ determined that the retrospective aspects of Dr. Chiu's opinion should be

28   assigned little weight when they are "based on a single evaluation of the claimant in 2007 by Dr.

United States District Court
Northern District of California

1    Leith with no other supporting objective medical evidence." *Id.* at 23.  However, this statement

2    does not provide any reasons, clear and convincing or otherwise, as to why Dr. Leith's testimony

3    should be discounted in any fashion such that Dr. Chiu's opinion, which was based in part on Dr.

4    Leith's statement, should be assigned little weight.  Notwithstanding the ALJ's discussion of

5    Mou's ability to take classes in college, go to movies, use public transportation, and other daily

6    routines[8], the ALJ does not identify anything in the medical or nonmedical record that contradicts

7    Dr. Chiu's assessment that Mou was unable to work following and as a result of the King Library

8    events.  In fact, Dr. Leith's contemporaneous report and analysis of psychological tests made prior

9    to Mou's date last insured reveals a showing of major depressive disorder and inability to work as

10   a result of these events.  *See id.* at 20 ("The claimant was subjected to psychological testing during

11   her evaluation, the results of which, Dr. Leith concludes, are consistent with a diagnosis of major

12   depressive disorder."), 342 ("Her complaints of depression and anxiety are supported by the

13   results of psychological testing, and there is no evidence of symptom exaggeration or

14   malingering.").  Dr. Chiu's report includes retrospective diagnoses in that Dr. Chiu found the

15   mental and emotional symptoms she detailed and personally witnessed from 2012 to 2013 were

16   found to be consistent with and a continuation of symptoms arising in 2005.  Because the ALJ

17   fails to properly take into account the retrospective nature of Dr. Chiu's uncontradicted medical

18   opinion, the ALJ erred in stating it was "essentially irrelevant to this determination."  *Id.* at 22.

### 3.  The ALJ Erred in Failing to Credit Dr. Mohammed's Retrospective Statements as Substantial Evidence

21       Unlike Dr. Chiu, Dr. Mohammed did not treat or interview Mou, instead basing his

22   medical opinions and testimony on his review of the record before the ALJ.  *Id.* at 102–03.  As

23   detailed above, Dr. Mohammed ultimately concluded, based on his review of the record, that

---

[8] The impact of Mou's daily routine on the ALJ's analysis is discussed in more detail below with respect to the ALJ's decision to find Mou only credible in part.  As discussed below, Mou's ability to attend classes and engage in certain social activities is not in itself grounds for discrediting Mou's own discussion of her disability and symptoms.  Further, in Dr. Leith's statement, which discusses these activities at length, Dr. Leith concludes that Mou was unable to work despite her daily routine with classes and occasional social outings.  AR 340.

Mou's symptoms were present during the relevant period and that Mou could not work during that period. *Id.* at 108. However, much like the ALJ's analysis of Dr. Chiu's testimony, the ALJ "accord[ed] little weight to the opinion of the impartial medical expert to the extent that it extends prior to August of 2012 based on a single evaluation of the claimant in 2007 by Dr. Leith with no other supporting objective medical evidence." *Id.* at 23.

While Dr. Mohammed was a non-treating medial expert, his testimony may still serve as substantial evidence where the rest of the record and medical evidence supports its findings. *See Morgan*, 169 F.3d at 600. Further, in the ALJ's own analysis, he implicitly states that Dr. Mohammed's testimony is not contradicted by either Dr. Chiu or Dr. Leith, assigning it great weight for its assessment in accordance with Dr. Chiu's testimony regarding Mou's symptoms after August 2012 and little weight for solely relying on Dr. Leith for the relevant period. AR 23. It is unclear on what grounds the ALJ finds Dr. Mohammed's testimony suspect for relying on Dr. Leith's own testimony, when the ALJ based his own evaluations on Dr. Leith's report as well. *See Id.* at 23–24.

The ALJ largely emphasizes the daily activities Mou was able to perform during the relevant period to establish that Mou was not as disabled as she let on, while simultaneously ignoring or discrediting Mou's own statements on the scope of her symptoms, her ex-husband Yang's assessment of her disorders, the statements of Dr. Leith on her inability to work and depression, the results of psychological testing corroborating Dr. Leith's testimony, Dr. Chiu's analysis following a year of psychotherapy sessions, and Dr. Mohammed's impartial review of the record as a whole. The ALJ fails to meet the clear and convincing standard for discrediting the retrospective aspects of Dr. Mohammed's opinion in light of its consistency with the record as a whole.

### C.    The ALJ Improperly Discredited Mou's Testimony

#### 1.    Legal Standard for Credibility Evaluations

"An ALJ engages in a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible." *Garrison*, 759 F.3d at 1014. First, "the ALJ must determine whether a claimant has presented objective medical evidence of an underlying

impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Id.* (internal citations omitted) (citing *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035–36 (9th Cir. 2007)).  For this first step, "the claimant is *not* required to show 'that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom.'"  *Id.* (quoting *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 2002)).  "If the claimant satisfied the first step of this analysis, and there is no evidence of malingering, 'the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so.'"  *Id.* (quoting *Smolen*, 80 F.3d at 1281).

An ALJ may consider a claimant's daily functioning in assessing the credibility of a claimant's testimony.  However, as part of this consideration, "evidence that [the claimant] could assist with some household chores [is] not determinative of disability."  *Cooper v. Bown*, 815 F.2d 557, 561 (9th Cir. 1987).  "Disability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity."  *Id.* (quoting *Smith v. Califano*, 637 F.2d 968, 971 (3d Cir. 1981)).  However, "the ALJ may discredit a claimant's testimony when the claimant reports participation in everyday activities indicating capacities that are transferable to a work setting."  *Molina v. Astrue*, 674 F.3d 1104, 1113 (9th Cir. 2012).  "Even where those activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment."  *Id.*

## 2.  The ALJ Improperly Assigned Only Partial Credibility to Mou

The ALJ concluded that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision."  AR 18.  The ALJ explained that "the lack of objective clinical and diagnostic findings supporting the claimant's allegations prior to her date last insured and her capacity to handle the rigors of a full class schedule in paralegal studies leaves the undersigned unable to accord more than partial credibility to the claimant."  *Id.*  The ALJ also pointed to Dr. Leith's recommendations of antidepressants and psychotherapy, along with Mou's

United States District Court
Northern District of California

failure to follow these recommendations, as further support of assigning only partial credibility to Mou, despite his acknowledgment that Mou's failure to promptly seek further treatment "may, at least in part, be due to cultural factors." *See id.* The evidence in this record shows no signs of malingering or exaggeration to warrant such a finding.

With respect to the objective medical evidence on record, Dr. Leith, Dr. Chiu, and Dr. Mohammed all indicated that there was no sign of malingering or exaggeration of symptoms on the part of Mou, that Mou's symptoms were indicative of depression and/or anxiety, and that Mou was unable to work in the relevant period. *Id.* at 108, 278–80, 342. Mou's own statements are in conformity with this and her discussion of daily activities does not contradict these findings or lead to a proper discrediting of Mou's testimony. Each of these doctors evaluated Mou's disabilities in relation to her level of functioning between 2005 and 2008, while taking into account Mou's activities, and found that despite her educational and social activities, she was disabled and unable to work during this time period.

With respect to Mou's daily activities between 2005 and 2008—such as using public transportation, going to movies, and attending classes—the Court finds this evidence insufficient to discredit Mou's testimony as to her symptoms because these activities have a tenuous connection with her ability to keep and hold a job on the national or local market as well as depression and anxiety generally. While the ability to go to paralegal studies, take public transportation, and attend occasional social outings could weigh against findings of disabling depressive or anxiety disorders insofar as such activities show that Mou was able to perform certain social functions, the ALJ fails to establish that this amounts to a clear and convincing basis for discrediting Mou's testimony, particularly in light of the rest of the record—including medical opinion evidence—indicating that Mou symptoms were severe enough to prevent her from working notwithstanding her paralegal classes and daily activities.

The ALJ's justification for discrediting Mou's testimony based on her failure to take antidepressants or psychotherapy sessions is not persuasive. At the time Dr. Chiu wrote her mental medical source statement detailing Mou's still-present depression and anxiety symptoms, Mou had taken ten months of weekly supportive therapy sessions with Dr. Chiu as well as trying

1    antidepressants. *See id.* at 278. There is nothing in Dr. Chiu's statement, or individual notes on

2    therapy sessions, to indicate that Mou was no longer depressed or anxious following these therapy

3    sessions.[9] *See id.* at 278–81; 283–311. In fact, Dr. Chiu's ultimate conclusion that Mou was

4    disabled by depression and anxiety after August 2012 postdated Mou's use of these treatment

5    methods suggested by Dr. Leith. The Court therefore rejects the Commissioner's argument that

6    Mou is ineligible for benefits on the grounds that "failure to follow prescribed treatment that can

7    restore an individual's ability to work without a good reason precludes the award of disability

8    benefits." *See* Def.'s Mot. at 9. The record in this case does not indicate that the proposed

9    treatments at issue "can restore [Mou's] ability to work," because Mou actually engaged in those

10    treatments later without success. Similarly, the Court finds the ALJ erred by finding Mou's failure

11    to promptly seek treatment undermined her credibility. Given that the ALJ acknowledged the

12    cultural reasons behind Mou's initial failure to seek treatment, the ALJ has not identified clear and

13    convincing reasons why Mou's failure to seek treatment earlier would weigh against the

14    credibility of her testimony in this case. *See* AR 18.

15       Mou's testimony and description of her symptoms is consistent with the testimony and

16    medical opinions of Dr. Leith, Dr. Chiu, and Dr. Mohammed, psychological testing taken during

17    the relevant period, her ex-husband Yang's description of her functioning, and the record as a

18    whole. The ALJ improperly emphasized Mou's ability to perform certain daily and social

19    activities (which are not inherently indicative of an ability to work) and failure to obtain further

20    medical treatment between 2008 and 2012 (which the ALJ acknowledged to be in-part the result

21    of cultural as opposed to medical factors) to find Mou only partially credible in her discussion as

22    to the severity of her symptoms following the King Library events. The ALJ fails to present clear

23    and convincing reasons for discrediting Mou's testimony.

24

25

26    [9] Dr. Chiu does make several notes throughout his sessions with Mou, as well as on his mental

27    medical source statement, that she has practiced techniques with Mou to help her alleviate her symptoms. *See e.g. id.* at 278 (client is "learning skills learned in session, however, she has some

28    difficulty in practice mindfulness skills").

**D.    The Commissioner's Other Arguments Fail as Outside the Scope of the ALJ's Reasoning**

In considering the ALJ's decision regarding Mou's disability claims, this Court may "review only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely." *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) (citing *Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003)).  Even if arguments put forth by parties could be adequate grounds for reversal, courts "are constrained to review the reasons the ALJ asserts." *Connett*, 340 F.3d at 874.  A court cannot, for example, "affirm the ALJ's credibility decision based on evidence that the ALJ did not discuss." *Id.*

The Commissioner begins her summary judgment motion with a discussion of the relevant period of disability that Mou must establish and an argument that Mou's claim is untimely.  *See* Def.'s Mot. at 1–2.  The Commissioner contends that "the earliest date a Plaintiff can receive [disability insurance benefits] is no earlier than the seventeenth month preceding the month in which she applied," and thus, "the earliest date [Mou] would have been eligible to receive [disability insurance benefits], if she could have established disability would have been August 2010." *Id.* at 2 (citing 20 C.F.R. § 404.315(a)(4)).  The Commissioner further contends that Mou "must also prove the current disability, if any, has existed *continuously* since a date on or before the date her insurance coverage lapsed to within 14 months of the date of application for Title II disability benefits." *Id.*

This Court's analysis here is constrained to reviewing the reasoning set forth by the ALJ. Because the ALJ focused his analysis on Mou's alleged disabilities prior to her date last insured, and did not consider the potential lapse of Mou's claims after her date last insured as grounds for denial, this Court cannot now affirm the ALJ's decision on these alternate grounds and declines to address this argument.

**E.    Further Administrative Proceedings Are Warranted**

Mou contends that this case should be remanded for an award of benefits.  As discussed below, however, the Court finds that further administrative proceedings are necessary.

If an ALJ has improperly failed to credit medical opinion evidence or claimant testimony, a district court must credit that testimony as true and remand for an award of benefits provided

1    that three conditions are satisfied:

2         (1) the record has been fully developed and further administrative
         proceedings would serve no useful purpose; (2) the ALJ has failed to
3         provide legally sufficient reasons for rejecting evidence, whether
         claimant testimony or medical opinion; and (3) if the improperly
4         discredited evidence were credited as true, the ALJ would be
         required to find the claimant disabled on remand.
5

6    *Garrison*, 759 F.3d at 1020.  Under such circumstances, a court should not remand for further

7    administrative proceedings to reassess credibility.  *See id.* at 1019−21.  This "credit-as-true" rule,

8    which is "settled" in the Ninth Circuit, *id.* at 999, is intended to encourage careful analysis by

9    ALJs, avoid duplicative hearings and burden, and reduce delay and uncertainty facing claimants,

10   many of whom "suffer from painful and debilitating conditions, as well as severe economic

11   hardship."  *Id.* at 1019 (quoting *Varney v. Sec'y of Health & Human Servs.*, 859 F.2d 1396,

12   1398−99 (9th Cir. 1988)).

13        A court may remand for further proceedings, however, "when the record as a whole creates

14   serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social

15   Security Act."  *Id.* at 1021.  A court may also remand for the limited purpose of determining when

16   a claimant's disability began if that date is not clear from the credited-as-true opinion.  *See House*

17   *v. Colvin*, 583 F. App'x 628, 629− 30 (9th Cir. 2014) (citing, *e.g.*, *Luna v. Astrue*, 623 F.3d 1032,

18   1035 (9th Cir. 2010)).  Outside of those circumstances, remand for further proceedings is an abuse

19   of discretion if the credit-as-true rule establishes that a claimant is disabled.  *Garrison*, 759 F.3d at

20   1020.

21        In this case, if nothing else, the Commissioner's argument regarding the timeliness of

22   Mou's claim creates serious doubt as to whether she is entitled to benefits, and should be

23   addressed through the administrative process in the first instance.  *See Def.'s Mot. at 1−3; 20

24   C.F.R. § 404.315.  The Court remands for further administrative proceedings to allow the

25   Commissioner to consider that issue as well as to reconsider whether Mou was disabled during the

26   relevant period after properly crediting Mou's testimony, Dr. Mohammed's retrospective medical

27   statements as a non-treating medical expert, and Dr. Chiu's retrospective statements as a treating

28   physician.

United States District Court
Northern District of California

1

IV.    **CONCLUSION**

2        The Court finds the ALJ erred in weighing the medical opinions of Dr. Chiu or Dr.

3    Mohammed as "essentially irrelevant" to Mou's conditions during the relevant period given their

4    retrospective nature and consistency with the record as a whole.  The ALJ also erred by

5    improperly discrediting the testimony and statements made by Mou given no evidence of

6    malingering or exaggeration in medical statements and testing as well as the consistency between

7    Mou's testimony and the record as a whole, including medical opinions put forth by Dr. Leith, Dr.

8    Chiu, and Dr. Mohammed.  The ALJ failed to present clear and convincing reasons supported by

9    substantial evidence for rejecting that evidence.  For the foregoing reasons, the Court GRANTS

10   Mou's Motion for Summary Judgment and REMANDS this case for further administrative

11   proceedings consistent with this order.

12        **IT IS SO ORDERED.**

13   Dated: March 30, 2017

14   _____

15   JOSEPH C. SPERO
     Chief Magistrate Judge

16

17

18

19

20

21

22

23

24

25

26

27

28